The Honorable, the United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Court is in session. Today's case will be called as previously announced and the times will be as allotted to counsel. The first case today is John R. Borzilleri et al. versus Bayer AG et al. Appeal Number 201066, Attorney Smith. Your Honors, may I please the Court? I would like to at this time request two minutes for rebuttal. You may. Thank you, Your Honor. Your Honor, this case is about tenfold price increases which happened only in the United States for multiple sclerosis drugs in decreasing use. The price increases began suddenly when Medicare Part D was implemented in 2006. Per patient prices for multiple sclerosis drugs increased tenfold from $10,000 per year to greater than $100,000 per year per patient, while at the same time prescription for these drugs went down 50 to 70%. There is obvious anti-competitive behavior here. The scheme involves fees paid by pharmaceutical companies to pharmacy benefit manufacturers under Part D as part of a secretive national contract tied to huge price increases. This has caused more than $60 billion in harm to patients, families, and taxpayers. The Court below did have a brief hearing and it granted the government's motion to dismiss based solely on the government's resource burden claims without considering the public harm. The government's resource burden argument is contradicted by its own actions. The government suddenly moved to dismiss this case 11 months after it declined to intervene and after briefing was filed by the parties on defendants' joint motions to dismiss. If the government had really wanted to reduce its resource burden, it could have waited to see whether defendants' joint motion to dismiss was successful. Instead, the government added immensely to its own resource burden by moving to dismiss this case itself. Theological timing and foreseeable increase in the government's burden... Counsel, excuse me, given what seems to be Congress's silence on the issue, by silence I mean what standard a court might apply in the kind of hearing we're talking about. How do you ground your claim that you were entitled to an evidentiary hearing to, I gather, test the government's claims that you're citing? Where does that claim come from? Well, in the first few weeks of law school, we all learn how to interpret a statute where a word is not defined. And the first thing we do is use the plain meaning rule. And Senator Grassley has actually stated that when he was drafting the 1986 amendments, his idea of the meaning of the word hearing denotes a proceeding in which a judge makes a determination based on evidence in the law. So that's the first thing. The second thing is we use statutory history to help us decide. And the Senate, in its Senate report 99-345 in 1986, 5266 at 5291, states that although an evidentiary hearing is not required, it should be granted when the relator shows a substantial and particularized need. Counsel, several courts of appeals have pointed out that legislative history, which was cited by the Ninth Circuit, is actually inapt. It really has nothing to do with the language that was actually enacted with respect to the 1986 amendment. So I don't understand how that legislative history helps you at all on the hearing issue. Well, I think... Four and a half minutes remaining, four and a half minutes. The relator presents a colorable claim that the dismissal is unreasonable in light of existing evidence. The lower court specifically refused to consider the magnitude of the fraud, again over $60 billion. And the government's claim that the case lacked merit is belied by its own filing in U.S. v. TEVA on August 18, 2020, where its allegations of a Medicare Part D price-fixing scheme are similar to relator's. Ms. Smith, let me ask you this. The settlement provision of this statute gives the court a very specific role in approving the settlement. And in the provision that's at issue here, it doesn't spell out any role other than the court is to preside over a hearing wherein the party has been notified. I exclude the same kind of detail provided in one section, that it was intentional that that type of hearing not be required for purposes of a motion to dismiss. Senator Grassley has addressed that in his letter of May 4, 2020, to the Attorney General's office. And it's his opinion that it was an omission, it was an oversight, it needs to be addressed by Congress. We're not Congress. No, we're not, and we don't legislate, that is true. But he alleges that the word hearing implies the weighing of evidence. And so, just the plain meaning of the word hearing, which is in the statute. Ms. Smith, you've twice answered questions by referring to post-enactment letters from Senator Grassley. I don't know of any recent Supreme Court authority, and maybe you could point me to a gap that says we should even look at something like that when we're trying to interpret a statute. Well, he is writing about what they were thinking in 1986. Even if Congress now were to say something, there are only certain circumstances. But one senator, whatever role he played, how can one senator tell us how to interpret a statute? I think that we are going to just use the plain meaning role. And even under the plain meaning role, this relator is entitled to an evidentiary hearing, some cost-benefit analysis. Because when somebody makes an allegation that they have resource burdens, they would necessarily make a cost-benefit analysis themselves. Am I correct that a dismissal of this type is not with prejudice as to the United States? In other words, a dismissal under 2A, when the government moves under 2A to dismiss an action, it may be with prejudice as to the relator, but it's not with prejudice as to the United States. Right. The United States could bring this action itself. Whereas if a case is settled under 2B, it's presumably going to be with prejudice as to the United States. Yes, that's correct. So it makes all the sense in the world that in 2A, Congress would simply say an opportunity for a hearing on the motion, period. Whereas in 2B, you not only get a hearing, but the court needs to determine that the settlement is fair, adequate, and reasonable. There's a reason why that latter provision would be in 2B and not in 2A. And yet it seems to me that you basically want us to add that clause back into 2A that Congress left out of 2B. I would argue that I'm not asking for that. I would say, though, that a dismissal is much more final than a settlement. And it makes sense that the standard for dismissal should be at least as strenuous as the one for a settlement. Well, why is that? Because when you say a dismissal is more final than a settlement, I see it just the opposite. The day after a settlement, that's it. No one can sue. The day after a motion to dismiss is filed and acted on and granted, the United States, in its own name, could bring this action. They could. They could. But the United States... And they have, haven't they? Haven't they pursued a couple of these theories against individual pharmaceutical companies? They have. They have. But the United States may be the main party in interest in False Claims Act case, but it's not the only party in interest. Okay. You may finish your answer. I did, Your Honor. Okay. Thank you. Any other questions from colleagues? No. Thank you. Ms. Romano? Romero? Sorry. That's okay. Can you see me? Yes. Can you hear me? Okay. Yes. Good afternoon, Your Honors. May it please the Court, Amy Romero, on behalf of the United States. While the False Claims Act allows private individuals, such as the appellant in this case, to bring civil fraud claims in the government's name, on behalf of the government, for harms done to the government, the Act also grants the government broad control over those actions, including the right to dismiss the case, notwithstanding the objections of the relator. And, as this Court pointed out in Carvelis, that's because it's the United States, it's the government, who is the real party in interest in QUTAM actions. How does the Court have a role other than potted plant in this? I really don't understand if your argument is that there's absolute discretion, that the SWIFT test should be the prevailing test. What's the role of the Court? Why bother to require a hearing? We think the hearing does have meaning. First, it allows the relator an opportunity to try to convince the government not to dismiss the case. But that has no role for the judge. In the D.C. Circuit decision, SWIFT did leave the door open, or ajar, to say that in exceptional circumstances, such as fraud on the Court, or maybe there's an unconstitutional motive, where the relator makes a plausible or credible showing, that would be an opportunity for the Court to consider denying the government's motion to dismiss. That is not the case here. In this case, the relator, there was no credible showing of fraud on the Court or unconstitutional motive. But that would be where a hearing would be important to safeguard against that sort of protection. I'd just like to be clear on what the government's position is, because in your brief, you seem to urge upon the decision of the D.C. Circuit in SWIFT, and then you file this 28-J letter in which you cite favorably the recent decision of the SWIFT approach. They adopt an approach where it seems on a constitutional basis to contemplate some role for the Court. What is your position? Which of those two approaches are you urging upon us? We would urge the SWIFT. We think the D.C. Circuit SWIFT decision is most soundly grounded in the statutory, the plain language of the statute, and the Supreme Court decision that Heckler v. Cheney. The Seventh Circuit decision that I filed the 28-J letter was to bring that because it was a recent case, Circuit case, directly on this issue, and that's something the Circuit hasn't decided. We wanted that to bring to the attention. The government disagrees with the finding that in the Seventh Circuit, they found that the government had to intervene first before proceeding with a dismissal motion, and we don't agree that the statute requires that, but we do think the SWIFT standard of unfettered discretion is one that is consistent with general Article II deference and prosecutorial discretion and the plain language of the statute. When, as you pointed out in the questions to counsel for appellant, when there are provisions that have substantive standards in the following provision for settlement, and many other provisions of good cause, and that is not the case in the dismissal provision, this court, and it's a familiar mode of statutory construction, this court has taken that approach before in Millennium Laboratories last year in Heinemann Guta. When Congress wants to put a certain standard in the False Claims Act, it does, and when it doesn't, we can take a negative inference from that. So here, there's no substantive standard of review in the dismissal provision, and we think therefore that courts' roles should be limited in reviewing those motions. Counsel, what frankly troubles me about SWIFT is it seems to base much of its reasoning on the scenario where there might be an attempt to tell, say, a prosecutor in a criminal case that you have to bring a certain type of action, that the court would be telling the executive that it has to initiate a prosecution. And that analogy seems quite inept in this setting, whereby statute relators are given a specific role, they are permitted to sue on behalf of the government, they're given an interest in any compensation that might be obtained, so this seems to be a very different scenario than the sort of the criminal slash prosecution side of the case. I mean, Congress has given relators a role here, and to suggest that courts might not have any role in protecting those interests seems to me to be a rather extreme position. I agree that the distinction between civil and criminal is quite different. Thank you. Where Congress has given relators the opportunity to essentially self-appoint themselves as the partial assignees of the United States, we think in C2A Congress has given the government the authority to revoke that assignment, essentially, and to say, no, you know, these are claims in our name. We don't want you filing those claims on our game. We don't want this case to go best position to decide what cases should go forward, when they should go forward, how they should go forward. It seems to me that even in the UCB case, the court referred to what I gather was a concession by the government, that there might be equal protection constitutional constraints on the grounds upon which the government would seek to dismiss the claims of relators. So, even in that case, the government did acknowledge some constitutional constraints in a way that the Swift court did not. Was such a concession made in the UCB case by the government? Yes, and we acknowledge that here as well, that absolutely there are constitutional constraints. We think that Swift did concede that in saying it, leaving the door open that said for bribery in the court or other extraordinary circumstances, which could be an unconstitutional motive, such as invidious discrimination. All that to say, in this case, there's no showing of that here. The relator has not raised any sort of unconstitutional motive. It's merely a disagreement with the government. The relator thinks that this case is worth a lot more than the government thinks it's worth. It's a disagreement with their timing of when the government chose to file the motion to dismiss, and those do not raise to the level. These are all prosecutorial judgment decisions. Counsel, isn't it true that in all the cases, the circuit court cases that have been discussed, the decision of the court of appeal was preceded by an evidentiary hearing in the district court? If we were to rule in your favor, wouldn't we be the first court of appeals to conclude that the district court was correct to not even hold an evidentiary hearing before making its ruling? An evidentiary hearing is not necessary. There's no requirement of that, and as I think you pointed out, Your Honor, in the questioning of my sister, is that the talk about the evidentiary hearing had to do with an unenacted Senate amendment. I don't know. I don't personally know whether all the circuit courts had an evidentiary hearing prior to that decision. That's something that I will have to look into and file a 28-J letter. The district courts held an evidentiary hearing. The district court, correct, prior to the circuit court decision. I apologize. I don't know whether that evidentiary hearing was held. I do know in Sequoia Orange, there was an evidentiary hearing, and in that case, the government moved to dismiss very far along into the case after it had intervened. There were 34 cases. It had intervened in 10 of them, hadn't intervened in others. There was settlement on the table, and in that, it had to do with timing decision of the citrus industry, and there was that. But all of this to say, I don't think any of the circuit courts have said that an evidentiary hearing is required or necessary, and I don't think here, there's any showing that an evidentiary hearing is required or necessary. The government shouldn't have to litigate its reasons. First of all, the relator and the government are supposed to be on the same side in theory, and the whole idea the government doesn't want this case to go forward is because of resource burden. So then to require the government to have to put on or defend an evidentiary hearing is counterproductive to this resource burden and also would make the government have to expose some of its prosecutorial enforcement decisions that really should not be subject to judicial review. Well, on that last point, you could have a case, I suppose, where the government felt there's a problem with the case. It doesn't want to devote resources and doesn't think the timing is good, but might see a way to figure out in the future how to get around that problem and be averse to disclosing now what it sees as the problem in the case. And if you had to have a hearing, you could be put in that position. Absolutely. There's a lot of policy decisions that come into play when the government decides whether to terminate and when to terminate a key TAM action. Any other questions from my fellow panel members? No, thank you. Thank you, Ms. Romero. You have a little time. Ms. Smith? Yes. In this matter, the relator submitted an unrebutted affidavit alleging investigative malfeasance and possible fraud. He had provided a list of 50 witnesses who admitted that this scheme existed and admitted that they were part of it. It would be very easy in a short evidentiary hearing like the one given in the Swift case, and Sequoia Orange had a four-day evidentiary hearing that this scheme was going on. It sounds like you'd be to convince the court that dropping the case is not fair, adequate, and reasonable, given the merits of the case that you've been able to uncover. I think it could be established very quickly that this scheme was in existence. That's what I'm saying. When I look at the B standard, it expressly says the court needs to decide that the proposed dismissal is fair, adequate, and reasonable. The hearing that you envision under 2A, at the end of that hearing, would the court, under your view, be required to make the same sort of determination that dismissal is fair, adequate, and reasonable? Not at all. What would it have to decide? It would have to decide that the relator had enough of a case to merit going forward. That's all. So, in other words, if it decided the relator's case has some merit, then the government couldn't dismiss it? No, I think it's more like, was it arbitrary or capricious? And that is what the relator alleged here, that it was arbitrary, that they had not investigated the main part of the case, and that they had not interviewed a single witness that he provided to them. Suppose they say, we just don't want to spend any time on this case now. That is something that is unreasonable, I think. Well, that's the reason for the Keaton provision in the first place. In 1943, the DOJ took over all the cases, and then they got overwhelmed, and then they put in the Keaton provision for situations where the government would not or could not take the case. Allowing the executive branch to make nonspecific resource burden claims, and then combining that with unfettered discretion to dismiss ongoing cases, opens a Pandora's box of potential corruption and possible favoritism. Okay, thank you, Your Honor. It's like giving the Department of Justice a ring of power. Thank you, Your Honor. Any other questions? No, thank you. Thank you, Counselor. That concludes the arguments for today. This session of the Honorable United States Court of Appeals is now recessed until the next session of the Court. God save the United States of America and this Honorable Court. Counsel, you may disconnect from the meeting.